UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

LORENZO REDD,

                          Plaintiff,

        -against-

P. CHARLES GARELL, M.D.;
WAINWRIGHT, M.D.; REMER, M.D.;
WESTCHESTER MEDICAL CENTER; DR.
RAZIA K. FERDOUS, Facility Health Services
Director; SONJI HENTON, Deputy Superintendent
of Health Services; DR. CARL J. KOENIGSMANN,
Deputy Commissioner and Chief Medical Officer;
and THOMAS GUDEWICZ, Nurse,

                         Defendants.

--------------------------------------------------------------x

**OPINION AND ORDER**

18 Civ. 09436 (JCM)

       Plaintiff Lorenzo Redd ("Plaintiff"), proceeding *pro se*, brings this action pursuant to 42

U.S.C. § 1983 ("Section 1983") against Defendants Dr. P. Charles Garell; Dr. John Wainwright;

Dr. Justin Remer; and the Westchester Medical Center ("WMC"), (collectively, "Defendants").

(Docket Nos. 2, 36).  Defendants[1] have moved for summary judgment pursuant to Federal Rule

of Civil Procedure 56 ("Rule 56"). (Docket Nos. 123, 130).  The motions are unopposed.  For the

reasons set forth herein, the Court grants Defendants' motions.[2]

---

[1] Defendant Dr. Garell is represented by separate counsel and filed his own summary judgment motion. (Docket No. 130).

[2] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 82).

## I. BACKGROUND

### A. Procedural Background

On October 15, 2018, Plaintiff commenced this action against Defendants Dr. Garell, Dr. Wainwright, Dr. Remer and WMC. (Docket No. 2).  On March 27, 2019, Plaintiff filed an amended complaint adding Defendants Dr. Razia K. Ferdous, Sonji Henton, Dr. Carl Koenigsmann and Thomas Gudewicz (collectively, "State Defendants"). (Docket No. 36). Construing the amended complaint liberally, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs, and that Defendants Henton and WMC retaliated against him in violation of the First Amendment. (Docket No. 36 at 3–16).  The State Defendants moved to dismiss, which was granted on March 11, 2020. (Docket No. 65).  Plaintiff's claims that Defendants Dr. Garell, Dr. Wainwright, Dr. Remer and WMC were deliberately indifferent to his serious medical needs and that WMC retaliated against him remain.

Presently before the Court are Defendants' motions for summary judgment. (Docket Nos. 123, 130).  Defendant Dr. Garell's summary judgment motion was accompanied by a memorandum of law, (Docket No. 124); a statement of facts pursuant to Local Civil Rule 56.1, (Docket No. 125); and a declaration, with exhibits annexed thereto, (Docket No. 126). Defendants Dr. Wainwright, Dr. Remer and WMC's (collectively, "WMC Defendants") motion for summary judgment was accompanied by a memorandum of law, (Docket No. 136); a statement of facts pursuant to Local Civil Rule 56.1, (Docket No. 132); and a declaration attaching twenty-one exhibits, (Docket No. 137).  Both motions included the required notice to *pro se* litigants opposing a motion for summary judgment, explaining the possible effect of a motion for summary judgment on Plaintiff's claims and highlighting Rule 56 and Local Civil Rule 56.1. (Docket Nos. 129, 133).  Defendant Dr. Garell's notice included a copy of Rule 56

and Local Civil Rule 56.1.[3]  Both notices warned Plaintiff that a failure to respond could result in the Court accepting Defendants' facts as true and dismissing Plaintiff's complaint. (*Id.*). The notices further advised that, according to Rule 56, Plaintiff "must submit evidence, such as witness statements or documents, countering the facts asserted by the defendant and raising specific facts" in support of his claim. (*Id.*).

Although Plaintiff did not respond to Defendants' summary judgment motions, there is no indication that he did not receive such motions.  Defendants filed Affidavits of Service indicating that the motions were served on Plaintiff at the address he provided the Court on December 15, 2021. (Docket Nos. 120, 131, 134, 135).  In addition, since Plaintiff failed to respond by the deadline, the Court issued an order on July 8, 2022, stating that "[i]f Plaintiff does not submit a response by July 22, 2022, the Court will deem this matter fully submitted and Defendants' motions unopposed." (Docket No. 138).[4]  Plaintiff never responded.  Moreover, the notices Defendants served on Plaintiff adequately apprised Plaintiff of the consequences of failing to respond to Defendants' motions for summary judgment. *See Johnson v. Reed*, No. 17 Civ. 8620 (NSR), 2023 WL 1868399, at *1 n.1 (S.D.N.Y. Feb. 8, 2023).[5]

---

[3] Defendant WMC's notice states that a full copy of Rule 56 is attached, but it is unclear whether a copy of both Rule 56 and Local Rule 56.2 were actually attached when it was served on Plaintiff, as required by Local Civil Rule 56.2.  However, there is no prejudice to Plaintiff because copies of both rules were served on Plaintiff as attachments to Defendant Dr. Garell's notice. (*See* Docket Nos. 129, 131, 133, 135).

[4] The Order was mailed to two addresses associated with Plaintiff.  The Order sent to the 93 Cunningham Avenue address was returned as undeliverable, but the copy sent to the address Plaintiff provided to the Court on December 15, 2021, was not returned.

[5] "In the Second Circuit, a district court cannot grant a motion for summary judgment in a case involving a *pro se* litigant unless (1) the court apprises the *pro se* litigant of the consequences of failing to respond to the motion, (2) an opposing party has already provided the *pro se* litigant with the requisite notice, or (3) it is clear that the *pro se* litigant understands the nature and consequences of summary judgment." *Johnson*, 2023 WL 1868399, at *1 n.1 (citations and internal quotations omitted).  Here, the Court and Defendants adequately apprised the *pro se* litigant of the consequences of failing to respond to Defendants' motions.

**B.  Facts**

The following facts are gathered from Defendants' Rule 56.1 statements, the exhibits attached to the parties' submissions, and the affidavits submitted by the parties in support of their contentions.[6]  The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).  The facts set forth in the Rule 56.1 statements are not in dispute. *See* Local Civ. R. 56.1(c); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible.").

At all relevant times, Plaintiff was a convicted prisoner in New York State custody. (*See* Docket No. 125 ¶ 9).  Plaintiff had a history of chronic back problems, for which he had received physical therapy, and was treated with medications prior to seeing Dr. Garell, a board-certified neurosurgeon, for treatment. (*Id.* ¶¶ 1, 11, 12, 13, 14, 17, 18).

**1.  Plaintiff's First Appointment with Dr. Garell – April 18, 2017**

Plaintiff initially met with Dr. Garell on April 18, 2017. (*Id.* ¶ 15).  At that appointment, Plaintiff presented with pain in his lower back and in both legs, with the pain in his right leg being worse. (*Id.* ¶ 16).  Plaintiff had an MRI at the time that indicated he had two herniated discs. (*Id.* ¶ 19).  Therefore, Dr. Garell offered to perform a transforaminal lumbar interbody fusion and explained the major risks with Plaintiff including, "infection, CSF [cerebral spinal fluid] leak, blood loss, transfusion, paralysis, etc." (*Id.* ¶ 20).  Dr. Garell further testified at his deposition that, following his routine practice, he would have offered the surgery option to Plaintiff as just one of a number of medical options Plaintiff could pursue to address his

---

[6] All page number citations to the record refer to the ECF page number unless otherwise noted.

condition. (Docket No. 126-1 at 14–15).  Plaintiff chose to proceed with the surgery. (Docket No. 125 ¶ 21).

### 2. Plaintiff's Back Surgery – July 5, 2017

On July 5, 2017, Dr. Garell performed a lumbar decompression and fusion surgery on Plaintiff at WMC. (*Id.* ¶ 22; Docket No. 126-2 at 8–10).  Plaintiff was 49 years old. (Docket No. 125 ¶ 8).  Prior to performing surgery, Dr. Garell told Plaintiff about "possible alternative treatments, including medication, injection and physical therapy," as well as the risks of the procedure. (Docket Nos. 125 ¶¶ 23, 25; 126-1 at 16–17).  Furthermore, "[a]ll risks, benefits, alternative[s] [were] explained to the [Plaintiff]." (Docket No. 125 ¶ 25).  Plaintiff "expressed [a] clear understanding of the procedure, possible complications, risks and intended benefits." (*Id.* ¶ 26).  "Consent was obtained and placed in the chart." (Docket No. 126-2 at 8).

Dr. Garell examined the equipment, including the instrument kits, that were to be used in Plaintiff's surgery, and did not recall having any issues with or complaints about them. (Docket No. 132 ¶ 13).  WMC provided the equipment to the doctor, including the screws and rods to be used in Plaintiff's surgery. (Docket No. 137-14 at 142-44).

Dr. Garell testified at his deposition that he did not recall anything occurring in the surgery that he did not expect. (Docket Nos. 132 ¶ 10; 137-14 at 40–41).  In addition, he had no recollection that the nursing staff did not follow his orders during the surgery. (Docket Nos. 132 ¶ 14; 137-14 at 153).  Dr. Garell could not specifically recall whether he had placed the screws during the procedure, or if the resident assisting him, Dr. Jared Cooper, had done so. (Docket No. 132 ¶ 11).  Dr. Garell confirmed, however, that if Dr. Cooper had placed the screws, it was under his direction and supervision, and Dr. Cooper had followed his orders during the procedure. (*Id.*

¶¶ 11, 12).  During surgery, Plaintiff had hypotension and, therefore, received a blood transfusion upon completion of surgery. (Docket No. 125 ¶ 27).

Dr. Garell found that post-operation X-rays showed "good alignment and hardware placement," and Plaintiff stated that "his leg pain was 'better than pre-op.'" (*Id*. ¶ 28).

### 3.  Plaintiff's First Post-Surgery Follow-up Appointment – August 7, 2017

At his first post-surgery follow-up appointment on August 7, 2017, Plaintiff reported that his leg pain was "minimal and improving." (*Id*. ¶ 29).  Plaintiff also stated that he was experiencing "cracking" in his right lower back and that he had some numbness in his left great toe and calf. (*Id*. ¶ 30).  Dr. Garell indicated that "there was still likely movement of Plaintiff's bones that would produce a cracking sound as they 'scarred into position.'" (*Id*. ¶ 31).

Dr. Garell testified at his deposition that although the cracking could have been related to the implants, that consideration "was not high on [his] list of differential diagnoses," because Plaintiff had undergone surgery one month prior and had improved leg pain, and thus a cracking sound from scarring "was a more likely explanation." (Docket No. 126-1 at 20, 23–24).  Dr. Garell "further recognized that the numbness in Plaintiff's toe and calf were indicative of 'settling of the nerve roots' that would resolve on its own." (Docket No. 125 ¶ 32).   "Overall, [Dr.] Garell's examination [of Plaintiff] showed 'good healing and full strength,' as Plaintiff ambulated 'without difficulty.'" (*Id.* ¶ 33).

Therefore, Dr. Garell recommended that Plaintiff should "start physical therapy, wean off the soft brace he was using and follow up [with Dr. Garell] in two months." (*Id.* ¶ 34).

### 4.  Plaintiff's October 30, 2017 Follow-up Appointment

At Plaintiff's next appointment with Dr. Garell on October 30, 2017, Plaintiff complained of "low back pain," but indicated that the pain in his legs was improving. (*Id.* ¶ 35).  Dr. Garell

noted that Plaintiff's incision was "healing well." (*Id* ¶ 36).  Dr. Garell further observed that Plaintiff's range of motion was "decreased in both flexion and extension as compared to what [Dr.] Garell would have expected for a patient almost four months post-surgery." (*Id.* ¶ 37).

Dr. Garell was concerned about Plaintiff's range of motion. (*Id.* ¶ 38). Therefore, he recommended physical therapy, "to increase [the] range of motion of the lumbar spine" and "help with [Plaintiff's] low back pain," as well as weaning Plaintiff out of the brace he was wearing over the course of four weeks. (*Id.*; Docket No. 126-1 at 31-32).  Dr. Garell further recommended that X-rays be taken of Plaintiff's lumbar spine "to check [the] hardware," and that Plaintiff follow up with him in three months. (Docket No. 126-1 at 31-32).

**5.  Plaintiff's February 6, 2018 Emergency Room Visit**

On February 6, 2018, Dr. Garell saw Plaintiff at the Putnam Hospital Center Emergency Room. (Docket No. 125 ¶ 39).  Plaintiff reported that his lower back pain had worsened after bending and hearing a "crack" in his back. (*Id.*).  Dr. Garell noted that Plaintiff ambulated on his own upon examination, had full strength in his extremities, and his incision was well healed. (Docket No. 126-2 at 3, 6).  Dr. Garell had X-rays taken to "determine whether there was a hardware complication or spinal malalignment." (Docket No. 125 ¶ 40).   The X-rays showed Plaintiff's spine had "good alignment and no hardware fracture or other complications." (*Id.* ¶ 41).

**6.  Plaintiff's March 27, 2018 Appointment**

Dr. Garell saw Plaintiff again on March 27, 2018. (*Id.* ¶ 42).  Plaintiff complained of right-sided lower back and hip pain. (*Id.* ¶ 43).  Plaintiff had recently started physical therapy. (*Id.* ¶ 44).  Recent X-rays showed there were "no hardware complications." (*Id.* ¶ 45).  Dr. Garell noted that Plaintiff ambulated without difficulty and his spinal alignment was "good." (*Id.*).  Dr.

Garell recommended continued physical therapy "to address Plaintiff's range of motion and strength." (*Id.* ¶ 46).  Dr. Garell also recommended that Plaintiff return for a follow-up appointment in six weeks, and to "consider consult to pain management for possible injection if pain does not improve with physical therapy." (Docket Nos. 126-1 at 41; 126-2 at 5).

**7. Plaintiff's Last Appointment with Dr. Garell – May 1, 2018**

Plaintiff saw Dr. Garell again on May 1, 2018. (Docket No. 125 ¶ 47).  "At this appointment, Plaintiff demanded that his shackles and restraints be removed for the examination and the guard stand outside with the examination room door closed." (*Id.* ¶ 48).  Dr. Garell refused to do this. (*Id.* ¶ 49).  Thus, Plaintiff remained in restraints and the guard stayed in the doorway of the examination room as Dr. Garell performed an examination of Plaintiff, including an evaluation of the movement of Plaintiff's back and legs. (*Id.* ¶¶ 50–51).  "Due to Plaintiff's demand, [Dr. Garell] was not 'comfortable' treating Plaintiff after this appointment and asked that any additional follow up [sic] appointment be handled by a different doctor." (*Id.* ¶ 52). "Plaintiff confirmed that the decision that he see a different doctor was 'mutual,' and that Plaintiff was ready to see someone new." (*Id.* ¶ 53).

**8. Plaintiff's Appointment with Other Doctors – June 8, 2018**

On June 8, 2018, Plaintiff was treated at WMC by Dr. Christian Bowers and Dr. Nathan Rawicki for complaints of continued back pain. (*Id.* ¶ 54).  Dr. Bowers was an attending neurosurgeon at WMC in 2018. (Docket No. 132 ¶ 15).  X-rays were taken of Plaintiff's lower back. (Docket No. 125 ¶ 55).  The X-rays showed that the screws in Plaintiff's back "were 'in good positioning.'" (*Id.* ¶ 56).  According to Plaintiff's medical records, the doctors also recommended continuing pain management and to follow up in two to three months for reevaluation. (Docket No. 126-4 at 4).

**9. Plaintiff's Later Treatment**

Plaintiff returned to the WMC clinic on August 1, 2018, complaining of back pain. (Docket No. 132 ¶ 16).  Plaintiff was seen by Dr. Remer and Dr. Wainwright, who referred him for physical therapy. (*Id.* ¶ 5).  Plaintiff was also examined by Dr. Bowers. (*Id.* ¶ 6).  Plaintiff explained to Dr. Bowers that, on July 17, 2018, he attempted to stand up and heard a crack, felt severe low back pain, and was wheelchair-bound for two to three days before returning to baseline. (Docket No. 125 ¶ 57).  Dr. Bowers referred Plaintiff to the emergency room for evaluation by a spine specialist. (Docket No. 132 ¶¶ 6, 17).  Dr. Chad Cole, an attending neurosurgeon at WMC, then admitted Plaintiff to the hospital for about three to four days. (*Id.* ¶¶ 7, 20).  Plaintiff testified that about three hours elapsed between being seen by a doctor and being sent for X-rays and other testing at the emergency room. (Docket No. 137-11 at 6–7).

X-rays and an MRI were then taken of Plaintiff's lower back in the WMC emergency room. (*Id.* at 1).  Thereafter, Dr. Bowers discovered a "hardware issue," (Docket No. 125 ¶ 58), namely, one of the surgical screws implanted in Plaintiff's back during the surgery had broken, (Docket No. 128-1 at 5–6).  Dr. Bowers and Dr. Cole offered Plaintiff another spinal surgery, which Plaintiff declined. (Docket No. 132 ¶¶ 3, 8, 18).

**C. Expert Opinions**

**1. Defendant Dr. Garell's Expert — Dr. Jack Stern**

Dr. Jack Stern, a board-certified neurosurgeon licensed to practice medicine in several states, including New York, submitted an expert report in support of Dr. Garell's motion for summary judgment. (Docket Nos. 128 ¶¶ 1, 2; 128-1).  Dr. Stern stated that he "[is] fully familiar with the standard of care applicable to [Plaintiff's treatment]." (Docket No. 128-1 at 2).  Dr. Stern is qualified to issue an expert opinion in this case, having been qualified as an expert in the

past and having performed "[p]robably at least 500" lumbar fusion surgeries of the type

performed on Plaintiff. (Docket Nos. 126-7 at 4; 128-1).  Dr. Stern reviewed medical records and

imaging from WMC, Dr. Garell and the New York State Department of Correctional Services, as

well as Plaintiff's amended complaint, Plaintiff's responses to Dr. Garell's interrogatories, and

the deposition transcripts of Plaintiff, Dr. Garell, Dr. Bowers, Nurse Valerie Monroe, Orrin Daw

and Daniel Robinson. (Docket No. 128-1 at 2).

 Dr. Stern opined with "a reasonable degree of medical certainty," and based on his

"knowledge and experience in the field of Neurological Surgery," that "all of the treatment

provided by Dr. Garell was within the standard of care and did not cause or contribute to any of

[Plaintiff's] alleged injuries." (*Id.* at 2, 6).  Dr. Stern also noted that "all providers agree (as do

the imaging studies) that the screw was not broken until after [Plaintiff] stopped treating with Dr.

Garell." (*Id.* at 5).  Further, Dr. Stern concluded that "Dr. Garell timely and properly considered

whether a hardware problem was the cause of [Plaintiff's] complaints" even in the face of

alternative reasons for the complaints. (*Id.*).  Additionally, Dr. Stern noted that Plaintiff's loss of

blood during the surgery, which led to his post-operative care in the ICU, was a "known risk for

any surgical procedure" and that "there is simply no basis to claim that it occurred due to any

negligence." (*Id.* at 4).  Her further opined that the blood loss "caused no harm to [P]laintiff, as it

was timely recognized and addressed." (*Id.*).

 Dr. Stern concluded that Plaintiff's restraints did not impede Dr. Garell's examination

and that the doctor-patient relationship between Dr. Garell and Plaintiff ended properly and

mutually. (*Id.* at 6).  Dr. Stern also stated that Dr. Garell had acted appropriately in his final

appointment with Plaintiff when: (1) he would have asked a guard to remove Plaintiff's restraints

if necessary; (2) nothing urgent needed to be addressed at the appointment; (3) he was

reasonably uncomfortable with removing Plaintiff's restraints and examining him without a guard present and the examination room door closed when Plaintiff "was a convicted criminal, a large man, and was described in other records as uncooperative;" and (4) when Plaintiff had no urgent condition that worsened due to anything that was done or not done during the visit. (*Id.*).

Additionally, Dr. Stern asserted that any contention that a lack of expiration date on the screws used in Plaintiff's operation indicates negligence is a "red herring." (*Id.* at 4–5). Certain medical hardware bears expiration dates, which refer to the effective sterilization of the devices, and which thereby help to prevent infection. (*Id.* at 5). These expiration dates have no bearing on the integrity of the hardware. (*Id.*). Moreover, not all medical hardware has an expiration date. (*Id.*). In fact, the screws used in Plaintiff's surgery, Dr. Stern noted, are within this class of hardware that lacks expiration dates and are sterilized at the hospital. (*Id.*).

Dr. Stern further opined that "[s]urgical hardware can break, even in the absence of medical negligence" and that the broken screw "[was] no indication of any negligence." (*Id.*). The breaking of the screw "[did] not in any way suggest that the screw itself was faulty, should not have been used, or that it was implanted improperly." (*Id.*). Further, "there is no medical basis to claim that the broken screw caused or contributed to any of [P]laintiff's complaints." (*Id.*). This is because Plaintiff's complaints of pain predated the broken screw and "there is no reason to believe that the [Plaintiff's] bones failed to fuse before the screw broke, in which case, the screw would only be the cause of symptoms if it was compressing a nerve, and there is no evidence of this." (*Id.*). Also, once the broken screw was discovered, Plaintiff was offered surgery but declined it. (*Id.*). Moreover, there "is no reason to believe that [Plaintiff] would have agreed to surgery had it been offered earlier," or "that this surgery would resolve the complaints that pre-dated the screw fracture." (*Id.*).

**2. WMC Defendants' Expert — Dr. Saran Rosner**

Dr. Saran Rosner was retained as an expert for the WMC Defendants. (Docket No. 137-17 at 14, 27, 32). Dr. Rosner testified that he had been practicing medicine in New York since 1984 and that he had practiced at WMC at various times prior to 2010. (*Id.* at 15–20). Dr. Rosner also noted that he had performed about 20 to 25 lumbar fusion surgeries in the past five years. (*Id.* at 20–23). The doctor clarified, however, that his specialty does not involve the implantation of instrumentation in a patient. (*Id.* at 21). Dr. Rosner reviewed the transcripts of Dr. Garell's and Dr. Bowers' depositions, as well as medical records pertaining to Plaintiff from WMC. (*Id.* at 28–36, 74–75). His review did not include the transcript of Plaintiff's deposition but did include Plaintiff's bill of particulars, which contained Plaintiff's claims. (*Id.* at 39–40). Dr. Rosner also spoke with industry representatives from companies that manufacture instrumentation similar to that used in Plaintiff's back surgery about whether or not those devices had expiration dates. (*Id.* at 37–38).

Ultimately, Dr. Rosner opined that between June 2018 and September 2018, neither WMC's, nor Dr. Remer's or Dr. Wainwright's treatment fell below or departed from the applicable standard of medical care. (*Id.* at 68–69, 75). Dr. Rosner further opined that neither Dr. Garell nor Dr. Bowers had exhibited deliberate indifference or a conscious disregard of Plaintiff's medical needs during Plaintiff's surgery or postoperative clinic visit. (*Id.* at 75; Docket No. 132 ¶ 25). Dr. Rosner also concluded that "[t]he care and treatment provided by [WMC] was at all times appropriate." (Docket No. 137-17 at 75).

Dr. Rosner opined that the standard of care does not "require a spine surgeon to specifically warn a patient in advance of surgery of the risk of broken screws." (*Id.* at 110). He also stated that Plaintiff's surgery was performed without significant complications. (*Id.* at 42).

Dr. Rosner further explained that the surgical screws used in Plaintiff's surgery do not have expiration dates. (*Id.* at 50). According to Dr. Rosner, there is also no evidence in Plaintiff's medical chart that the screws used in the operation were defective, nor does the appearance of the screws in the X-ray show any issue. (*Id.* at 50–59). Further, Dr. Rosner also confirmed that "a surgical screw may break in the absence of medical negligence," and finding a broken surgical screw by itself does not provide "any indication that there had been medical negligence." (*Id.* at 109–10).

Regarding Plaintiff's blood loss during surgery, Dr. Rosner opined that, although it is "not routine" for a patient to lose 1,000 milliliters of blood during surgery, this can occur in the absence of medical negligence, and in his expert opinion there was no deviation from the standard of care here. (Docket No. 137-17 at 42–46, 75, 106). He further stated that patients going to the ICU for treatment following surgery is "not routine," but was also "not infrequent." (*Id.* at 48). Finally, Dr. Rosner stated that the approximately three-hour period of time between Plaintiff's admission to WMC on August 1, 2018, and his trip to the emergency room on that day did not constitute a delay. (*Id.* at 69–70).

## II. LEGAL STANDARDS

### A. Summary Judgment Standard

Under Rule 56, the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could

decide in the non-movant's favor." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "'A fact is material if it might affect the outcome of the suit under the governing law.'" *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (quoting *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 50 (2d Cir. 2009)).[7]

In reviewing a motion for summary judgment, the Court should only consider "evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.* 164 F.3d 736, 746 (2d Cir. 1998). In addition, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). That said, the Court may not weigh the evidence or determine the truth of the matter, but rather conducts "the threshold inquiry of determining whether there is the need for a trial . . . ." *Anderson*, 477 U.S. at 250.

The moving party bears the initial burden of "demonstrating the absence of a genuine issue of material fact." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). If the moving party meets this initial burden, the burden then shifts to the non-moving party to "present evidence sufficient to satisfy every element of the claim." *Id.* "The non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial,'" *id.* (quoting *Celotex*, 477 U.S. at 324), and "must do more than simply show that there is some metaphysical doubt as to the material facts,"

---

[7] If Petitioner does not have access to cases cited herein that are available only by electronic database, then he may request copies from Defendants' counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the pro se litigant with copies of such unpublished cases and other authorities as are cited in a decision of the Court and were not previously cited by any party.").

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Indeed, as the

Second Circuit has held:

> to show a genuine dispute, the nonmoving party must provide hard evidence, from
> which a reasonable inference in [its] favor may be drawn. Conclusory allegations,
> conjecture, and speculation, as well as the existence of a mere scintilla of evidence
> in support of the [nonmoving party's] position, are insufficient to create a
> genuinely disputed fact.

*Hayes v. Dahlke*, 976 F.3d 259, 267–68 (2d Cir. 2020) (internal citations and quotations omitted;

alterations in original); *see also Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d

Cir. 2015) (noting that a nonmoving party on summary judgment "'may not rely on conclusory

allegations or unsubstantiated speculation.'") (quoting *Brown v. Eli Lilly & Co.,* 654 F.3d 347,

358 (2d Cir. 2011)).  Further, if the non-moving party fails to establish the existence of an

essential element of the case on which it bears the burden of proof at trial, summary judgment

must be granted. *Celotex*, 477 U.S. at 322–23.

Parties moving for and opposing summary judgment in the Southern District of New

York must also submit short and concise statements of facts, supported by evidence that would

be admissible at trial. Local Civ. R. 56.1.  The opposing party must specifically controvert the

moving party's statement of material facts, or the moving party's facts will be deemed admitted

for purposes of the motion. Local Civ. R. 56.1(c); *T.Y.*, 584 F.3d at 418 ("A nonmoving party's

failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in

the statement are uncontested and admissible.").  However, uncontested facts cannot be deemed

true simply by virtue of their assertion in a Local Rule 56.1 statement; the Court is free to

disregard the assertion in the absence of citations or where the cited materials do not support the

factual assertions in the statements. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir.

2001).  The Court therefore has discretion "to 'conduct an assiduous review of the record' even

-15-

where one of the parties has failed to file such a statement." *Id.* (quoting *Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000)); *see also* Fed. R. Civ. P. 56(c)(3). Nevertheless, the Court is "not required to consider what the parties fail to point out." *Monahan*, 214 F.3d at 292 (quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978)). Additionally, when Defendants seek summary judgment against a *pro se* litigant, the Court must afford "special solicitude" to the non-movant. *See, e.g.*, *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir.1994) (holding district court "should have afforded [*pro se* litigants] special solicitude before granting [a] motion for summary judgment").

## B. Deliberate Indifference

Plaintiff was a "convicted and sentenced prisoner" at the time of the misconduct he alleges, therefore, the Court must analyze his claims of deliberate indifference under the Eighth Amendment.[8] (Docket No. 36 at 2); *see King v. Falco*, 16-CV-6315 (VB), 2018 WL 6510809, at *7 (S.D.N.Y. Dec. 11, 2018). The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994)). "[N]ot every lapse in medical care is a constitutional wrong." *Id.* "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)) (alteration in original). A plaintiff may prevail on a deliberate indifference claim by satisfying a two-prong test. *Sutton v. Rodriguez*, 18-CV-01042

---

[8] Although Plaintiff "asserts deliberate indifference claims under both the Eighth and Fourteenth Amendments," (Docket No. 36 at 16), the Court will only analyze this claim under the Eighth Amendment because the Fourteenth Amendment does not apply here. The Fourteenth Amendment only applies to a pre-trial detainee's claim for deliberate indifference to serious medical needs. *See Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017).

(PMH), 2020 WL 5504312, at *4 (S.D.N.Y. Sept. 8, 2020).  This test has an objective prong and

a subjective — *mens rea* — prong. *See id.* at *4–*5*; see also Salahuddin*, 467 F.3d at 279–80.

The objective prong requires that that "the alleged deprivation of adequate medical care

must be 'sufficiently serious.'" *Id.* at 279 (quoting *Farmer*, 511 U.S. at 834).  "To determine

whether the deprivation was sufficiently serious, a court must first ascertain whether 'the

prisoner was actually deprived of adequate medical care,' keeping in mind that 'the prison

official's duty is only to provide reasonable care.'" *Williams v. Smith*, No. 02 Civ. 4558 (DLC),

2009 WL 2431948, at *7 (S.D.N.Y. Aug. 10, 2009) (quoting *Salahuddin,* 467 F.3d at 279).

Second, a court must determine whether "the alleged deprivation of adequate medical care [was]

'sufficiently serious.'" *Spavone v. N.Y.S. Dept. of Corr. Serv.,* 719 F.3d 127, 138 (2d Cir. 2013)

(quoting *Salahuddin,* 467 F.3d at 279).  The inquiry into whether the inadequacy of medical care

is sufficiently serious "requires the [C]ourt to examine how the offending conduct is inadequate

and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*,

467 F.3d at 280.  This inquiry "contemplates 'a condition of urgency' that may result in

'degeneration' or 'extreme pain.'" *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37

F.3d 63, 66 (2d Cir. 1994)).

"If a plaintiff alleges that he received no medical care for his medical condition, 'courts

examine whether the inmate's medical condition is sufficiently serious.'" *Crichlow v. Doccs*, 18-

CV-3222, 2022 WL 6167135, at *10 (S.D.N.Y. Oct. 7, 2022) (quoting *Salahuddin*, 467 F.3d at

280).  However, "[i]n cases where the inadequacy is in the medical treatment given, the

seriousness inquiry is narrower." *Salahuddin*, 467 F.3d at 280.  In such cases, "it's the particular

risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the

severity of the prisoner's underlying medical condition, considered in the abstract, that is

relevant [for a court's focus] for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). Thus, "[e]ven in cases where an inmate 'suffers from an admittedly serious medical condition,' if the alleged deficiencies in treatment are 'minor and inconsequential,' those lapses will not sustain an Eighth Amendment claim." *Williams*, 2009 WL 2431948, at *7 (quoting *Smith*, 316 F.3d at 186). The "'objective component of an Eighth Amendment claim is . . . [necessarily] contextual' and fact-specific . . . ." *Smith*, 316 F.3d at 185 (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)) (alteration in original).

The second prong—the *mens rea* component—requires Plaintiff to establish that Defendants were aware of Plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm to him. *See Salahuddin*, 467 F.3d at 280. Plaintiff must prove "that the official acted with deliberate indifference to [an] inmate['s] health. Deliberate indifference is a mental state equivalent to subjective recklessness." *Id.* (internal citation omitted). "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Id.*

Moreover, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance*, 143 F.3d at 703; *see also Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (showing of medical malpractice alone does not support an Eighth Amendment claim). Finally, the Court also recognizes the well-established principle that an inmate's "mere disagreement over the proper treatment does not create a constitutional claim." *Chance*, 143 F.3d at 703. In fact, the Second Circuit has held that

if "the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*

## III.  DISCUSSION

Defendants argue that Plaintiff's claims of deliberate indifference and medical malpractice and negligence should be dismissed on summary judgment.  In support of their motions, Defendants submit expert opinions.  The Court has reviewed the record and finds that Dr. Stern and Dr. Rosner are both qualified experts and that their expert opinions are admissible under Federal Rule of Evidence 702. *See Cacciola v. Selco Balers, Inc.*, 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) (citing *Raskin v. Wyatt Co.*, 125 F.3d 55, 66–67 (2d Cir. 1997)) ("Evidence contained in an expert's report therefore [] be evaluated under Fed. R. Evid. 702 before it is considered in a ruling on the merits of a summary judgment motion.").

### A.  Plaintiff's Deliberate Indifference Claims

Plaintiff argues that Dr. Garell was deliberately indifferent to his serious medical needs in violation of his constitutional rights. (Docket No. 36).  Specifically, Plaintiff maintains that Dr. Garell denied him proper treatment by refusing to give him "a full examination many times," inserting screws into his back that were "[too] long," refusing "many times" to address his pain, and by refusing on May 1, 2018 "to tell the officer to take off the shackles and cuffs to give [him] a full mobility examination." (*Id*. at 6–7).  Dr. Garell counters that his treatment of Plaintiff "was at all times appropriately directed to address Plaintiff's back and lower body pain," and "there was medical support for each step he took." (Docket No. 124 at 15).  Dr. Garell's expert, Dr. Stern, agrees that Dr. Garell's treatment was appropriate. (*Id.*).  Plaintiff further asserts that the WMC Defendants also failed to treat him with an appropriate standard of care in violation of his constitutional rights. (Docket No. 36).  The WMC Defendants counter

that the undisputed facts show that their treatment of Plaintiff did not constitute deliberate indifference, thus entitling them to summary judgment. (Docket Nos. 130, 136). Dr. Rosner, the WMC Defendants' expert, agrees that the WMC Defendants did not exhibit deliberate indifference or conscious disregard of Plaintiff's medical needs. (*See* Docket No. 137-17).

Plaintiff fails to establish the first requirement—that he was actually deprived of adequate medical care. Plaintiff was seen by a board-certified neurosurgeon, Dr. Garell, who diagnosed his condition and provided him with a treatment plan, which included surgery. (Docket No. 125 ¶¶ 1, 15-46). It is clear from the record that Dr. Garell discussed the benefits and risks of the procedure with Plaintiff. (*Id*. ¶¶ 23-25). Moreover, Plaintiff expressed clear understanding and consented to the procedure. (*Id.* ¶ 26). "The operation [then] went as planned with nothing occurring [Dr. Garell] did not expect." (Docket No. 132 ¶ 10). Although Plaintiff suffered blood loss and was sent to the ICU after surgery, (Docket Nos. 125 ¶ 27; 126-2 at 2), Dr. Stern opined that neither the blood loss, nor Plaintiff's referral to the ICU post-surgery, establish that Dr. Garell was negligent because blood loss is a known risk in any surgical procedure, and Plaintiff's blood loss "was timely recognized and addressed." (Docket No. 128-1 at 4). Further, post-operative X-rays showed "good alignment and hardware placement." (Docket No. 125 ¶ 28).

Following Plaintiff's surgery, Plaintiff saw Dr. Garell for follow-up care five times between August 2017 and May 2018. (*See, e.g.*, Docket No. 125 ¶¶ 29, 35, 39, 42, 47). At each appointment, Dr. Garell assessed Plaintiff's recovery, as well as addressed Plaintiff's concerns, through examinations and medical tests including X-rays. (*See, e.g.*, Docket No. 125 ¶¶ 33, 34, 36, 37, 38, 39, 40, 41, 43, 44, 45, 46, 51). After reviewing Plaintiff's medical records, records from this case, and relevant testimony, Dr. Stern opined that the screws in Plaintiff's back remained intact throughout Dr. Garell's care of him, and that the medical care Dr. Garell

provided Plaintiff was adequate under accepted standards of medical treatment. (Docket No. 128-1 at 2, 5).  Dr. Stern specifically considered whether Dr. Garell deviated from accepted standards of care when he refused Plaintiff's request to examine him without restraints, behind closed doors and without a guard present, and concluded he did not. (*Id.* at 2, 6).  Plaintiff's conclusory assertions that Dr. Garell was deliberately indifferent when he allegedly refused to give him full examinations at times, used screws that were too long, did not adequately address Plaintiff's pain, and erred in refusing to allow Plaintiff to remove his restraints during their last appointment, are not supported by the record.

After Dr. Garell stopped treating Plaintiff, he was seen by other physicians for regular follow-up care. (*See, e.g.*, Docket Nos. 125 ¶ 54; 132 ¶¶ 3, 5, 6, 7, 8, 16, 19, 20, 22).  Subsequent X-rays revealed that a screw used in the surgery had broken. (Docket Nos. 125 ¶ 58; 128-1 at 5–6; 132 ¶ 21).  Plaintiff was offered another surgery to correct this issue, which he declined. (Docket No. 132  ¶¶ 3, 4, 18).  Dr. Rosner, the WMC Defendants' expert, concluded that between June 2018 and September 2018, none of the WMC Defendants' treatment of Plaintiff fell below or departed from the applicable standard of care. (Docket No. 137-17 at 68–69, 75). This includes the period in which Dr. Wainwright and Dr. Remer recommended physical therapy, Dr. Bowers referred Plaintiff to the emergency room, and the approximately three-hour waiting period Plaintiff experienced during that process. (*See id.*).  Dr. Rosner explicitly opined that the three-hour lapse of time was not significant enough to constitute a departure from the standard of care to which any patient in Plaintiff's situation would be entitled. (*Id.*).  Moreover, Plaintiff never specifically asserts that this alleged lapse of time exacerbated his condition. *See, e.g.*, *Liverpool v. Davis*, 442 F. Supp. 3d 714, 737 (S.D.N.Y. 2020) (granting summary judgment where plaintiff waited three hours for medical treatment but did "not allege[] that the delay in

treatment caused his condition to worsen").  Further, both Dr. Stern and Dr. Rosner opine that

the surgical screw breaking does not indicate any negligence. (Docket Nos. 128-1 at 5; 137-17 at

109–10).  Accordingly, Plaintiff has not established as a matter of law that he was deprived of

adequate medical care.  Since the Court has found that Plaintiff has not been deprived of

adequate medical care, there is no need to determine whether the alleged deprivation of medical

care was sufficiently serious. *See, e.g.*, *Sutton*, 2020 WL 5504312, at \*4–\*5.

      Moreover, even assuming, *arguendo*, that Plaintiff has satisfied the objective prong, he

does not establish the subjective portion of the two-prong deliberate indifference test. *See id*. at

\*5.  Under the subjective prong, Plaintiff must demonstrate that Defendants "had a sufficiently

culpable state of mind," *i.e.*, Defendants were aware of Plaintiff's serious medical needs and

acted with deliberate indifference to Plaintiff's health. *Id*.; *see Salahuddin*, 467 F.3d at 280.

Here, the record is devoid of any evidence establishing that Defendants "knew of and

disregarded the [P]laintiff's serious medical needs." *Chance*, 143 F.3d at 703.  "[T]he fact that

[Plaintiff] might prefer a different treatment does not give rise to an Eighth Amendment

violation." *Id.*  Therefore, even assuming Plaintiff could objectively demonstrate that he was

deprived of adequate medical care, there is no evidence showing that Defendants acted with the

culpable state of mind necessary to find deliberate indifference.  Accordingly, Defendants are

entitled to summary judgment on Plaintiff's deliberate indifference claims.

## B.  Plaintiff's Medical Malpractice and Negligence Claims

      Plaintiff also appears to allege in his interrogatory responses that Defendants were

negligent and committed medical malpractice. (Docket Nos. 124 at 11–12; 126-6 at 4–5; 136 at

8–10).  Plaintiff's specific claims against Defendants are numerous.  To begin, Plaintiff's

negligence and/or medical malpractice claims against Dr. Garell consist of challenges to the

doctor's standard of care in: (i) overseeing Plaintiff's surgery; (ii) implanting hardware into Plaintiff that "malfunctioned or broke;" (iii) allowing Plaintiff to enter hypervolemic shock during the surgery; (iv) allegedly failing to verify that the screws and other hardware used were in working order; and (v) using screws that did not have an expiration date. (Docket No. 137-18 at 4–5). Plaintiff further asserts that Dr. Garell committed negligence and/or medical malpractice by: (i) recommending the surgery that was performed on Plaintiff, including failing to explain alternative options and recommending the procedure that would earn the doctor the most money; (ii) allegedly "failing to review the integrity of the hardware installed in Plaintiff" during follow-up visits; and (iii) refusing to continue seeing Plaintiff as a patient. (Docket No. 126-6 at 4–5). Plaintiff alleges that Dr. Wainwright and Dr. Remer were negligent and/or committed medical malpractice when they "repeatedly denied Plaintiff's request for an [X]-ray and an MRI." (Docket No. 137-18 at 5). Additionally, Plaintiff claims that Defendant WMC was negligent and/or committed medical malpractice by providing the materials, resident surgeons and staff for Plaintiff's surgery, and by allegedly refusing to provide Plaintiff with medical attention on November 28, 2018. (Docket No. 137-18 at 4–5).

To the extent these claims constitute a "functional amendment" to the complaint, *see E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 252 (2d Cir. 2014) (noting that district court treated party's interrogatory responses as a "functional amendment" to its pleadings and assessing the "adequacy of [the complaint] and interrogatory responses" under relevant pleading standards); *Boisjoly v. Aaron Manor, Inc.*, No. 3:21-cv-01621 (MPS), 2022 WL 17272372, at *4 n.3 (D. Conn. Nov. 29, 2022) (noting that the Second Circuit's decision in *E.E.O.C.* treated interrogatory responses "as a functional amendment to the complaint"), Plaintiff has failed to

raise a genuine dispute of material fact that Defendants were negligent or committed medical malpractice in their treatment of him.

"[M]edical malpractice is but a species of negligence and no rigid analytical line separates the two." *Gjini v. United States*, No. 16-CV-3707 (KMK), 2019 WL 498350, at *9 (S.D.N.Y. Feb. 8, 2019) (quoting *Naughright v. Weiss*, 857 F. Supp. 2d 462, 474 (S.D.N.Y. 2012)).  The "[c]ritical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached.  'When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence.'" *La Russo v. St. George's Univ. Sch. of Med.*, 936 F. Supp. 2d 288, 304 (S.D.N.Y. 2013), *aff'd*, 747 F.3d 90 (2d Cir. 2014) (quoting *Stanley v. Lebetkin*, 507 N.Y.S.2d 468 (2d Dep't 1986))(internal citations omitted); *see also Gjini*, 2019 WL 498350, at *8–*12 (outlining the distinctions under New York law between claims against medical providers sounding in ordinary negligence as opposed to medical malpractice).  Here, Plaintiff's negligence claim arises out of both the patient-physician relationship and is also substantially related to medical treatment, thus, it must be evaluated in the context of medical malpractice.

"In order to prove a medical malpractice claim in New York, Plaintiff must establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries.'" *Moore v. Shahine*, 18 Civ. 463 (AT) (KNF), 2021 WL 827694, at *4 (S.D.N.Y. March 4, 2021) (quoting *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016)).  If a defendant accused of medical malpractice demonstrates that he "did not depart from good and accepted medical practice or that any departure did not proximately cause plaintiff's injuries" than he is *prima facie* entitled to summary judgment. *Id.* (citing *Ongley v. St. Lukes Roosevelt Hosp. Ctr.*, 725 F. App'x 44, 46 (2d Cir. 2018)).  To overcome this *prima facie*

entitlement to summary judgment, Plaintiff must present "expert testimony that there was a deviation from accepted standards of medical care and that such deviation was the proximate cause of the injury." *Moore v. Shahine*, No. 21-711, 2022 WL 2118945, at *1 (2d Cir. June 13, 2022) (quoting *Hytko v. Hennessey*, 879 N.Y.S.2d 595, 598 (3d Dep't 2009)); *see also Sitts v. United States*, 811 F.2d 736, 739-40 (2d Cir. 1987) (noting that, except in rare cases, such as "where an unexplained injury has occurred to a part of the body remote from the site of the surgery," New York plaintiffs are required to introduce expert testimony to establish a *prima facie* claim of medical malpractice); *Potter v. United States*, 17-CV-4141 (AJN), 2020 WL 2836440, at *4 (S.D.N.Y. May 30, 2020) ("[T]his is not the 'rare' medical malpractice action in which expert testimony is unnecessary to establish the elements of Plaintiff's claim, and Plaintiff does not argue that it is."). Thus, by failing to submit an expert report in support of his position, Plaintiff has failed to overcome Defendants' *prima facie* entitlement to summary judgment. *See, e.g.*, *Potter,* 2020 WL 2836440, at *9 ("'If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate.'") (quoting *Zeak v. United States*, No. 11 Civ. 4253 (KPF), 2014 WL 5324319, at *11 (S.D.N.Y. Oct. 20, 2014)).

Notwithstanding this procedural bar, the Court also determines that Plaintiff's claims that Defendants breached a duty of care are not supported by the record. Briefly, Dr. Stern's unrebutted opinions affirm that Dr. Garell's treatment of Plaintiff met the applicable medical standard of care. (Docket No. 128-1 at 2). Moreover, Dr. Stern and Dr. Rosner rebut the specific allegations that Plaintiff makes. For instance, Dr. Stern confirms that the surgical screws used in Plaintiff's operation do not bear expiration dates and that this is expected in the medical field and does not indicate that their integrity was compromised. (Docket No. 128-1 at 4–5). Further, Dr.

Rosner states that Plaintiff's medical records, including X-rays of his back, showed no indication that the screws were defective. (Docket No. 137-17 at 50–59).  Moreover, Dr. Stern also confirmed that a surgical screw breaking does not indicate negligence. (Docket No. 128-1 at 5). Furthermore, Dr. Rosner confirmed that the Plaintiff's going into hypovolemic shock does not mean that Dr. Garell was negligent. (Docket No. 137-17 at 106).  Additionally, contrary to Plaintiff's assertion, Dr. Garell stated that the surgery he performed on Plaintiff was not the most lucrative one that he could have recommended. (Docket No. 137-14 at 135–36).[9]  Further, Dr. Rosner opined that Defendants did not deviate from the appropriate standard of care, were not negligent, and did not commit medical malpractice. (Docket No. 137-17 at 68–69, 75).[10] Accordingly, Defendants are entitled to summary judgment on these claims.

### C.  Plaintiff's First Amendment Retaliation Claim

Plaintiff asserts a First Amendment retaliation claim against WMC for "multiple reschedul[ed]" appointments. (Docket No. 36 at 9).  WMC failed to address this issue in their summary judgment motion.  Nevertheless, district courts "[possess] the power to grant summary judgment *sua sponte* when neither party has moved for such relief," *see, e.g.*, *Dempsey v. Town of Brighton*, 749 F. Supp. 1215, 1220 (W.D.N.Y. 1990), *aff'd sub nom. without opinion, Curenton v. Town of Brighton*, 940 F.2d 648 (2d Cir. 1991), and it is "clear that a case does not present an issue of material fact," *Project Release v. Prevost*, 722 F.2d 960, 969 (2d Cir. 1983). A district court may exercise this power "if the losing party has been given adequate notice and

---

[9] Specifically, Dr. Garell stated during his deposition that the back surgery he recommended to Plaintiff was the most expensive (*i.e.* the most lucrative for the medical provider) of the reasonable options available, but that "there [were] other options that one could consider that would make even more money." (Docket No. 137-14 at 135–36).

[10] In reaching this conclusion, Dr. Rosner specifically considered Plaintiff's loss of an estimated 1,000 milliliters of blood during the surgery, (Docket No. 137-17 at 42), and noted that blood loss can occur in the absence of medical negligence, and in his expert opinion, there was no deviation from the applicable standard of care here, (*Id.* at 42–46, 75, 106).  Dr. Stern also concluded that "there is simply no basis to claim that [Plaintiff's blood loss] occurred due to any negligence." (Docket No. 128-1 at 4).

opportunity to present all evidence." *Lee Loi Indus. v. Impact Brokerage Corp.*, 473 F. Supp. 2d 566, 568 (S.D.N.Y. 2007) (citing *Celotex*, 477 U.S. 317, 326).   Here, Plaintiff received adequate notice and opportunity to present all his evidence in support of his First Amendment retaliation claim. *See Lee Loi Indus.*, 473 F. Supp. 2d at 568 (citing *Celotex*, 477 U.S. at 326).   Defendants served their summary judgment motions on Plaintiff, as well as served the required notice. (Docket Nos. 122, 129, 133, 135).   Moreover, the Court extended Plaintiff's time to respond to the summary judgment motions *sua sponte*, while warning Plaintiff that failure to respond would deem Defendants' motions unopposed. (Docket No. 138).   Plaintiff had ample opportunity to respond. *See, e.g.*, *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

Therefore, the Court will address Plaintiff's retaliation claim.   "To adequately plead a First Amendment retaliation claim, a plaintiff must plausibly allege: (i) he engaged in constitutionally protected speech or conduct; (ii) a defendant took adverse action against him; and (iii) the protected activity and adverse action are causally connected." *Redd v. Garell*, 18 CV 9436 (VB), 2020 WL 1189491, at *7 (S.D.N.Y. Mar. 12, 2020) (citing *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015)).   "An adverse action in this context is 'conduct that would deter a similarly situated individual of ordinary firmness.'" *Dinler v. City of New York*, No. 04 Civ. 7921 (RJS) (JCF), 2012 WL 4513352, at *26 (S.D.N.Y. Sept. 30, 2012) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 273 (2d Cir. 2011)).   Moreover, "Courts approach prisoners' retaliation claims 'with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Redd*, 2020 WL 1189491, at *7 (quoting *Dolan*, 794 F.3d at 295).   "Accordingly, a

prisoner pursuing a retaliation claim must not rest on 'wholly conclusory' allegations, but rather must allege 'specific and detailed' supporting facts." *Id.* at *7 (quoting *Dolan*, 794 F.3d at 295).

While the Second Circuit has stated that Section 1983 protects inmates from "otherwise routine administrative decisions [that] are made in retaliation for the exercise of constitutionally protected rights," *Gill v. Mooney*, 824 F.2d 192, 194 (2d Cir. 1987), Plaintiff has not set forth sufficient allegations to support a retaliation claim against WMC.  Plaintiff has plainly alleged the first element of a retaliation claim because it cannot be disputed that he engaged in protected activity by filing his lawsuit.  However, his retaliation claim fails on the second and third elements.

As to the second element, Plaintiff's only assertion, that the hospital *rescheduled* his November 28, 2018 appointment a number of times, without more, does not amount to a claim of an adverse action. (Docket No. 36 at 13–16); *see Malsh v. Austin*, 901 F. Supp. 757, 761 (S.D.N.Y. 1995) ("A rescheduled routine dental appointment is not atypical, nor did it pose a significant hardship to the [plaintiff-inmate] in relation to the ordinary incidents of prison life . . . ."); *Rose v. Goldman*, No. 02 CV 5370 (NGG) (LB), 2009 WL 4891810, at *13 (E.D.N.Y. Dec. 9, 2009), *report and recommendation adopted*, 2011 WL 1130214 (E.D.N.Y. Mar. 24, 2011) (inconvenient scheduling of probation appointments on Mondays and on a holiday, and refusing to reschedule an appointment to accommodate plaintiff's desire to attend a religious service "does not constitute unlawful retaliation" (internal quotations omitted)).  Thus, even assuming, *arguendo*, that all of the facts that Plaintiff alleges regarding the rescheduling of his November 28, 2018 appointment are true, he does not establish the second element of a claim of retaliation as a matter of law.

Furthermore, Plaintiff does not assert a sufficient causal connection between the alleged adverse action and his filing of the present lawsuit, and thus, has not meet the third element. (Docket No. 36 at 13–16).  Plaintiff's wholly conclusory allegations are insufficient to establish the requisite casual connection. (*Id.*); *see, e.g., Rose*, 2009 WL 4891810, at *13 ("Even if plaintiff established that defendants' actions were adverse, his retaliation claims would still fail as he has not established facts supporting an inference of a causal connection between the adverse action and the protected conduct.").

Accordingly, the Court grants Defendant WMC's summary judgment motion on Plaintiff's retaliation claim.

## IV. CONCLUSION

For the forgoing reasons, Defendants' motions for summary judgment are granted.  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion and Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal.

The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 123 and 130), to enter judgment for Defendants, and to mail a copy of this Opinion and Order to the *pro se* Plaintiff.

Dated:   March 30, 2023
    White Plains, New York

              **SO ORDERED:**

              JUDITH C. McCARTHY
              United States Magistrate Judge